1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MILOS LEUBNER,

11              Plaintiff,                    No. 2:08-cv-0853 GEB JFM PS

12        vs.

13   COUNTY OF SAN JOAQUIN, et al.,           ORDER AND

14              Defendants.                   FINDINGS & RECOMMENDATIONS

15   _____/

16              On July 12, 2012, the court held a hearing on defendant Thomas Mazzera's

17   ("Mazzera") motion for summary judgment and defendant Christopher Holden's ("Holden")

18   motion for summary judgment.  Plaintiff Milos Leubner appeared in pro per.  Marjorie Manning

19   appeared for Mazzera.  Dana Suntag appeared for Holden.  Upon review of the motions and the

20   documents in support and opposition, and good cause appearing therefor, THE COURT FINDS

21   AND ORDERS AS FOLLOWS:

22   /////

23   /////

24   /////

25   /////

26   /////

1

1          FACTUAL BACKGROUND[1]

2  A.    Introduction

3          This case arises from juvenile dependency proceedings initiated in San Joaquin

4  County.  Plaintiff is the father of twin girls, Cleariana[2] and Champagne[3] Leubner (collectively,

5  "the minors" or "the children"), born March 17, 1995.  TAC, ¶ 12; Cleariana Dep. 26:7.  Plaintiff

6  is not, and has never been, married to the children's mother, Dolores Boddy ("Boddy" or "the

7  mother").  Pl.'s Dep. 46:17-24, 47:9-10, 54:23-25.  Throughout their lives, the children have

8  lived with each parent off-and-on, though in the years leading up to the incidents at issue in this

9  case, they lived primarily with plaintiff in Kelseyville, California.  Cleariana Dep. 27:12-23,

10  33:8-12.  This custody arrangement was based on mutual agreement rather than a court order.

11          Some time in early April 2006, the minors, eleven years old at the time, arrived in

12  San Joaquin County to visit their mother, who was living at the home of defendant Donna Dones

13  ("Dones"), Boddy's boyfriend's mother, in French Camp, near Stockton, California.  Holden

14  Decl., Ex. C. at 7.  On April 10, 2006, the mother filed a petition in the San Joaquin County

15  Superior Court seeking legal and physical custody of the minors.  Id.

16  B.    Deputy Luck's Police Report

17          On April 24, 2006, Deputy Jeffrey Luck of the San Joaquin County Sheriff's

18  Department, was dispatched to the home of Dones for a temporary custody order dispute.

19  Holden Decl., Ex. C (Doc. No. 222-6 at 20-25[4]).  The following is gleaned from the narrative

20  contained in the police report prepared by Deputy Luck ("the Police Report"): Plaintiff allowed

21

22          [1]  All facts are undisputed unless noted otherwise.

23          [2]  Cleariana also goes by the name Kia.  Cleariana Dep. 7:10, July 27, 2011.

24          [3]  Champagne also goes by the name Pinka.  Cleariana Dep.  47:15-16; Suntag Decl., Ex.
    F at 51:16-18.

25          [4]  Because some documents have not been assigned a page number and/or the numbering
    system is unclear, the court will cite to the exhibit number of a document and, when necessary,
26  to the document's associated docket and page number.

                                        2

1   his daughters to visit Boddy in early April 2006, but has been unable to get a hold of either of

2   them for the previous few weeks.  Id. (id. at 23) When he finally spoke to one of his daughters,

3   he was told that they were enrolled in Neil Hafley Elementary School in Manteca, California.

4   Id.  With that information, plaintiff went to the school on April 24, 2006 to pick up his

5   daughters.  Id.  He had with him a temporary custody order from the Lake County Superior

6   Court.  Id.  Boddy refused to release the children to him and police were called.  Id.  On arrival

7   at the school, the responding officer convinced plaintiff to wait until a May 8, 2006 court date

8   before taking the minors into custody.  Id.

9           Later that same day, plaintiff appeared at Dones's residence to take custody of the

10  children when the police were called again.  Holden Decl., Ex. C (Doc. No. 222-6 at 23).

11  Deputy Luck spoke to Dones, who stated that she was afraid the children were unsafe with

12  plaintiff "because there may be some type of abuse going on."  Id.  She stated that prior to

13  Deputy Luck's arrival, Boddy and the children ran from the home on foot because they were

14  upset.  Id.

15          Deputy Luck contacted Boddy and convinced her to return to the Dones residence

16  with the children.  Holden Decl., Ex. C (Doc. No. 222-6 at 23-24).  On their return, Boddy and

17  the children "became very upset and began to cry, stating that they did not want to go with

18  [plaintiff]."  Id.  Per the Police Report, "[the minors] told [Deputy Luck] that [plaintiff] ha[d]

19  pornography all over his house, ha[d] taken pictures of them while they are nude, and that he

20  corporally discipline[d] them with a plastic stick with metal objects on the end of it."  Id. (id. at

21  24).

22          The Police Report included Champagne's statement to Deputy Luck:

23          (V)[5] Champagne LEUBNER told me she is not comfortable being with her
            father, (S) LEUBNER, because she believes he abuses her because he hits her with
24          a stick, he has slapped her, and he has kicked her.  She said that when she was nine

25  _____

26      [5] According to the Police Report, "V" stands for Victim, "S" stands for Suspect and "R"
    stands for Reporting Party.  See Holden Decl., Ex. C (Doc. No. 222-6 at 22).

years old she was in the shower with her sister when her father came in and took pictures of them through a translucent shower curtain.  She said that he told them to pose for him.  (V) Champagne LEUBNER said that her father has never touched her inappropriately but that she feels it is wrong that he is taking pictures of her when she was nude and that it makes her feel uncomfortable.  She said that (S) LEUBNER is an angry and frustrated person, especially ever since their mother, (S) BODDY, has been trying to gain custody.  She said that her father leaves pornographic magazines of women committing sex acts all over the house in different rooms.  She said her father also watches pornography at night when he thinks that they are asleep.

(V) Champagne LEUBNER told me that they have a friend who lives near them in Kelseyville on a street called Clark Lane named Jordan CROUCH who is a seven year old white female juvenile with blond hair who (V) Champagne LEUBNER said is a witness to (S) LEUBNER physically abusing her and her sister by putting them in a closet and hitting them with a plastic stick that has metal objects on the end of it.  (V) LEUBNER described this stick as possibly a broken piece of tent stake.  (V) Champagne LEUBNER told me that there was a separate occasion where (S) LEUBNER photographer her nude and it was on a camping trip in July 2005 at a place called Cobb Mountain.  She said that she and her sister were int heir bathing suits playing in a stream when their father requested that they take their clothes off for photographs.  She said she initially denied the request because she felt uncomfortable but that he kept asking her so she complied.  She said that during the time he was taking these photographs he asked her to touch her sister's butt and to take different poses.

Holden Decl., Ex. C (Doc. No. 222-6 at 24).

The Police Report also included Cleariana's statement to Deputy Luck:

(V) Cleariana LEUBNER told me that she does not want to be in the custody of her father because although she loves him she feels like he is an angry person and she does not like it when he hits her.  She said that he is scary when he is mad and that he has called her names like, "drugged up whore."  She said she believes if she does not do something properly or well enough that he does not love her and that he makes her "work for his love."  She said that while some of the physical discipline that (S) LEUBNER has given her has been being hit with a stick wit metal objects on the end of it.  She could not describe the stick further.  She said the stick has left welts on her as well as a small scar on her stomach.  She pulled up her shirt to show me the mark and I saw an approximate half inch very light scar mark on her stomach that may or may not be consistent with this stick.  (V) Cleariana LEUBNER said that her father has been mad at her and slapped her as recently as two weeks ago, giving her a bloody nose.  (V) Cleariana LEUBNER also spoke about an incident when she was nine years old of (S) LEUBNER taking pictures of her and her sister in the shower, as well as the incident where (S) LEUBNER took nude photographs of them while they were playing in the stream during a camping trip in July of 2005.  She said that she does not feel comfortable when (S) LEUBNER does these things and she does not think it is right.

Holden Decl., Ex. C (Doc. No. 222-6 at 24-25).

4

1    Based on the children's statements[6], Deputy Luck took the children into

2 protective custody and placed them at Mary Graham Children's Shelter ("MGCS").  Holden

3 Decl., Ex. C (Doc. No. 222-6 at 24).

4 C.    Egi's Interviews and the Detention Report

5    On April 25, 2006, defendant Kenneth Egi, an emergency response social worker,

6 conducted interviews with Boddy, plaintiff and the children.  See Holden Decl., Exs. A-B.  His

7 notes of these interviews are set forth in a Delivered Service Log ("DSL"), which is a record of a

8 social worker's significant activity in a case and prepared at or around the time of the significant

9 activity.  See Holden Decl. ¶ 4.

10    Egi's DSL notes of his April 25, 2006 in-person interview with Boddy provides:

11 "The mother indicated her wish to have the children returned to her custody. . . . The mother

12 admitted that the children have been raised by their father the majority of their lives but in the

13 past two years or so the father has been getting abusive with the children.  The mother indicated

14 she has observed bruises on the children in the past but the father explained them away.  Only

15 recently has she learn[ed] of father's behavior towards the children."  Holden Decl., Exs. A at 2-

16 3, B at 2-3.

17    Egi's DSL notes of his April 25, 2006 telephone interview with plaintiff provides

18 that plaintiff raised the children the majority of their lives, Boddy spent the last five years in

19 Alaska, and Boddy is in a "domestic violent relationship with drug use" with her boyfriend.

20 Holden Decl., Exs. A at 3, B at 3.

21    Egi's DSL notes of his April 25, 2006 in-person interview with the children

22 provides: "Champagne and Cleariana indicated their wish to return to the custody of their

23

24    [6] There is evidence in the record that indicates Deputy Luck's decision to place the
children into protective custody was based solely on statements made by Boddy and Dones at the
25 Dones residence, and that the children were not interviewed by Deputy Luck until after their
arrival at MGCS.  See, e.g., Cleariana Dep. 95:7–96:21, 98:5-15; 100:4-7; 107:8-18.  This fact is
26 immaterial to the disposition of defendants' motions.

mother.  They do not want to be placed with their father due to father's cussing, physical abuse and father taking nude photos of the girls when they were about nine years old."  Holden Decl., Exs. A at 2, B at 2.

Egi's interviews served as the basis for a Detention / Jurisdiction Report ("the Detention Report") that he prepared.  See Holden Decl., Ex. C.  According to the Detention Report, the children detailed emotional, physical and sexual abuse:

> [The minors] described their father as always cussing at them, very physically abusive and taking nude photos of them when they were about nine years old.  Cleariana and Champagne indicated that the father constantly cusses at them, uses the "F word", "B word", calling them whores and other cuss words.  The cussing is to the point where they feel very uncomfortable around the father, as they could not do anything right.  Further, Cleariana and Champagne described numerous incidents of being hit with father's hand, a stick with a plastic end and belts.  Cleariana and Champagne recalled having bloody noses, cut lips and black eyes from being slapped on the face/cheek area.  Cleariana and Champagne indicated they were afraid to tell anybody about the abuse, as the father had control over them.  In addition, Cleariana and Champagne indicated that about two years ago, the father took photos of them in the nude.  The last incident was on July 25, 2005, as they saw dates on their nude photos.  The father initially had them in bathing suits swimming in a local creek but later told them to take off their swimsuits so he could take photos.  The photos occurred about three or four times in the past two years.  Further, Cleariana and Champagne indicated that the father would show the nude photos to his friends.

Holden Decl., Ex. C (Doc. No. 222-6 at 15).

D.      Holden's Petition

On April 26, 2006, defendant Christopher Holden, assigned to replace Egi as the social worker for the children, prepared a Juvenile Dependency Petition ("the Petition").  See Holden Decl. ¶¶ 1, 8-10; Ex. C.  The Petition sought continued detention of the children pursuant to Cal. Welf. and Inst. Code § 300(a) (Serious Physical Harm); § 300(b) (Failure to Protect); and § 300(d) (Sexual Abuse).  The Petition repeated the factual allegations set forth in the Police Report and the Detention Report.

/////

/////

/////

E.   The April 27, 2006 Detention Hearing

On April 27, 2006, the dependency court held a detention hearing.[7]  Suntag Decl., Ex. F at 1-6.  There, Mazzera was appointed to represent the minors.  Id. at 4.  Mazzera, an attorney in private practice since 1981, has never been an employee of San Joaquin County, any of its agencies or any other governmental entity or agency.  Mazzera Decl., ¶ 2.

Plaintiff's appointed counsel stated on the record that although plaintiff was opposed to the detention of the children, he agreed to their short-term detention at MGCS.  Suntag Decl., Ex. F at 5.  Following discussion of counsel, the court found that placing the minors in the home of either parent was contrary to their welfare.  Id. at 6.  Accordingly, the court ordered the minors detained and placed in the custody of the Human Services Agency ("HSA").  Id.  The court scheduled a jurisdictional hearing for May 16, 2006.  Id.  The children were thereafter placed into foster care.  Pl.'s Dep. 374:9-12.

F.   Holden's First Meeting with the Children

On May 3, 2006, Holden first met with the children in the hallway at the courthouse.  Holden Decl., ¶ 12; Cleariana Dep. 120:17-22.  During this visit, Champagne agreed to supervised visit with plaintiff for one hour every two weeks.  Holden Decl. ¶ 12, Exs. A at 3, B at 3.  Cleariana, however, told Holden that she was scared to see plaintiff and did not

---

[7]  Dependency proceedings involve a number of hearings, including an initial detention hearing, jurisdictional and dispositional hearings, periodic review hearings, a permanency review hearing, and a hearing to terminate parental rights.  See Cal. Welf. & Inst. Code §§ 355, 358, 360, 366, 366.21–366.26.  A child becomes a dependent of the court when a finding is made that the child is a person described in California Welfare and Institutions Code section 300 due to abuse, neglect, or other prescribed circumstances.  "When a child is adjudged a dependent child of the court on the ground that the child is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child, including medical treatment, subject to further order of the court."  Cal. Welf. & Inst. Code § 362(a); see In re William T., 172 Cal. App. 3d 790, 797–798 (1985) (noting that once the juvenile court assumes jurisdiction over a dependent child, it controls "the physical custody, control and care of" the child).  "The central purpose of dependency proceedings is to protect the welfare and best interests of the child ...."  Doe v. Mann, 285 F. Supp. 2d 1229, 1237 (N.D. Cal. 2003), aff'd, 415 F.3d 1038 (9th Cir. 2005), cert. denied, 547 U.S. 1111 (2006).

1  wish to visit with him.  Holden Decl. ¶ 12; Exs. A at 3, B at 3.  Holden prepared a report based

2  on this meeting.  See Suntag Decl., Ex. F at 10-11.

3          During her deposition in this case, Champagne stated that her statements to

4  Holden were correct.  Champagne Dep. 124:16–125:10.  Also in this case, Cleariana testified

5  that she told Holden she wanted to live with her mother, and she testified that she never asked

6  Holden for visitation with plaintiff.  Cleariana Dep. 120:23-25, 156:1-3.

7  G.      The May 4, 2006 Visitation Hearing

8          On May 4, 2006, the juvenile court held a visitation hearing after plaintiff

9  requested visitation with the children.  See Suntag Decl., Ex. F at 7-12.  At this hearing, the court

10  disagreed with plaintiff's counsel's assertion that the nude photographs that plaintiff took of the

11  minors was not unusual or abnormal.  Id. at 11.  Regarding plaintiff's request for visitation, and

12  based on Holden's May 3, 2006 report following his visit with the minors, counsel for HSA

13  asked that any visitation with Champagne be supervised and any visitation with Cleariana be at

14  the discretion of the social worker.  Id. at 10.  Mazzera requested additional time to visit with the

15  minors to confirm the substance of Holden's report.  Id. at 11; Mazzera Decl. ¶ 6.  After

16  discussion, the court authorized supervised visits with Champagne on alternate weeks, but

17  determined that there would be no visitation with Cleariana until she and her attorney were

18  agreeable to visits.  Suntag Decl., Ex. F at 11-12.

19  H.      Mazzera's May 5, 2006 Meeting with the Minors

20          As a court-appointed attorney in juvenile dependency proceedings, Mazzera was

21  required by the Administrative Office of the Courts to record information in a computer form to

22  keep a record of time expended in each assigned case on a daily basis.  See Mazzera Decl., ¶ 9;

23  Ex. A.  The data entered in the form includes the case name or number, type of service provided,

24  hours expended and other information.  Id.  Mazzera's notes reflect that he met with the minors

25  on May 5, 2006, June 19, 2006 and July 14, 2006.  Id. Ex. A at 2, 11, 16.

26  /////

1   On May 5, 2006, Mazzera met in-person with the children.  Mazzera Decl., ¶ 7;

2  Ex. A at 11.  At the beginning of this meeting, Mazzera initially understood Champagne to be

3  amenable to supervised visits with her father every other week for one hour, and understand that

4  Cleariana did not want to visit with plaintiff.  Mazzera Decl., ¶ 7.  At the conclusion of the

5  meeting, however, both children stated that they did not want any visits with their father.  Id.

6   On May 8, 2006, Holden asked Mazzera regarding his meeting with the minors.

7  Holden Decl., ¶ 14, Exs. A at 4, B at 4; Mazzera Decl., ¶ 7.  Mazzera informed Holden that

8  neither minor wished to see plaintiff.  Holden Decl., ¶ 14, Exs. A at 4, B at 4.  Based on this

9  information, Holden calendared a court hearing for review of plaintiff's visitation with the

10  minors.  Id.

11   On the morning of May 8, 2006, plaintiff traveled to Stockton for visitation with

12  the children, but was turned away by Holden because the minors did not want to see plaintiff.

13  Pl.'s Dep. 156:8-13, 187:24–188:5.  This was the only time plaintiff was denied visitation with

14  the children.  Pl. Dep. 189:2.

15  I. The May 9, 2006 Visitation Hearing

16   On May 9, 2006, the court held a second visitation hearing.  Suntag Decl., Ex. F

17  at 13-19.  During this hearing, Mazzera stated that, based on his meeting with the minors, they

18  no longer wished to visit with plaintiff, but "they would entertain letters from [plaintiff] as long

19  as they go through the social worker."  Id. at 15.  Contrary to plaintiff's assertion in the TAC, the

20  transcript does not reflect that Mazzera said the children were "terrified" of plaintiff.  See id.;

21  Mazzera Decl., ¶ 8; TAC ¶ 53.  Plaintiff's counsel stated that although plaintiff wanted

22  visitation, "[h]e understands the position of the minors."  Suntag Decl., Ex. F at 16.

23  Accordingly, the court ordered that there be no person-to-person visitation between the minors.

24  Suntag Decl., Ex. F at 16.  The court did allow plaintiff to have contact with the children by

25  letters through the social worker.  Id.

26  /////

On June 19, 2006, Mazzera spoke to one or both of the children by phone. Mazzera Decl., ¶ 9; Ex. A at 11.

J.      Referral to Therapist

On June 20, 2006, Holden referred the minors to Bonnie Tweedy for therapy. Holden Decl., ¶ 16.  Cleariana testified that she told Tweedy that she did not want to see or talk to plaintiff.  Cleariana Dep. 141:18-25, 369:16-21.  Champagne told Tweedy that she was uncomfortable about seeing plaintiff, that she did not want to attend counseling with him, that she wanted to live with her mother, and that plaintiff had hit her.  Champagne Dep., 162:20–163:3, 166:13-15, 167:5-7.

Tweedy relayed her observations and opinions of the children to Mazzera, and they were consistent with her subsequent trial testimony that the minors did not want to see plaintiff and she believed forced contact would be detrimental to them under the circumstances. Mazzera Decl., ¶ 18.

On July 5, 2006, Holden prepared a case plan for the dependency court ("the Case Plan").  Holden Decl., Ex. H.  The Case Plan set forth the history of the case, noted that the children did not want visitation with plaintiff, and provided an assessment / evaluation for reunification of the children with their parents.  Holden recommended that the minors be adjudged dependents of the courts and that the court find that removing the minors from plaintiff's physical custody was necessary due to "substantial danger to the physical health, safety, protection, physical and emotional well-being of the minors."  The Case Plan was based on findings of fact, including plaintiff's use of profanity directed at the children, plaintiff's physical abuse of the children, plaintiff's taking of nude photographs of the children, and the existence of pornography throughout plaintiff's residence.

On July 14, 2006, Mazzera met with the children in-person.  Mazzera Decl., ¶ 9; Ex. A at 16.

/////

K.    The July 17, 2006 Hearing

On July 17, 2006, the court held a jurisdictional / disposition hearing.  Suntag Decl., Ex. F at 24-33; Holden Decl., ¶ 20; Mazzera Decl., ¶ 10.  This hearing was initially scheduled for May 16, 2006, but was continued because plaintiff retained private counsel. Suntag Decl., Ex. F at 20-23.

At the July 17, 2006 hearing, plaintiff pled no contest to all but two allegations in the Petition and stipulated to the factual basis of the Petition.  Suntag Decl., Ex. F at 26-29. Plaintiff also requested that he be allowed visitation with the children.  Id. at 29.  In response, counsel for HSA stated that "[t]he children have been adamant at this point they're afraid of their father.  They do not want to see their father.  They're here this morning but scared to death they're going to have to be next to their father or see him."  Id.  Mazzera confirmed HSA counsel's statements: "I spoke to [the children] several times about contact with their father and their answer is the same every time.  They're very adamant about not having any contact."  Id. Following discussion of counsel, the court authorized visitation between plaintiff and the children if it could be done in a therapeutic setting and with the approval of the therapist.  Id. at 30-31.  The court also reviewed, approved and ordered the Case Plan prepared by Holden.  Id. at 31.  Finally, Mazzera requested, and the judge ordered, that the children's new social worker contact him before any visitation with the children was scheduled.  Id. at 32.  Mazzera made this request based on his observations of and conversations with the children, most recently on the day of the jurisdictional hearing, during which the children appeared to Mazzera to be "visibly upset and crying."  Mazzera Decl. ¶ 10.

As a Court Services worker, Holden's job was to handle the case only through the jurisdictional / disposition hearing.  Holden Decl., ¶ 23.  Accordingly, a few days after this hearing, the case was transferred to social worker Debra Lewis, and Holden had no further involvement in the case.  Id.  Plaintiff testified in his deposition that he did not have interactions with Holden after early-August 2006.  Pl.'s Dep. 123:5-17.

L.      The November 8, 2006 Hearing

In November 2006, CPS filed a Status Review Report / Case Plan Update ("the November 2006 CPS Report") in anticipation of the November 8, 2006 jurisdictional hearing. Mazzera's Request for Judicial Notice ("RJN"), Ex. 3.  Mazzera received and reviewed the report.  Mazzera Decl. ¶ 7.  Mazzera understood the report to state that plaintiff had completed anger management and parenting classes, and was participating in sexual abuse counseling, though he continued to deny inappropriate behavior with the children.  Id.  The report also stated that plaintiff lacked empathy for the children's feelings and would need to address and resolve his issues prior to CPS making a recommendation for visitation with the children.  Id.

On November 8, 2006, the court held a hearing.  Manning Decl., Ex. E.  Plaintiff, through counsel, requested supervised visitation with the children as there has been no evidence of detriment to the children.  Id. at 2-3.  Accordingly, the court scheduled the matter for an evidentiary hearing on December 18, 2006 to determine whether supervised visitation with Leubner would be detrimental to the children.  Id. at 3.  The court also authorized supervised visits with the children at the discretion of the social worker.  Id. at 3-4.  Mazzera requested that the social worker contact him before exercising that discretion.  Id. at 4.

M.      The December 18, 2006 Evidentiary Hearing

On December 18, 2006, the court held an evidentiary hearing to determine whether visitation with plaintiff would be detrimental to the children.  Suntag Decl., Ex. F at 34-47.  At the hearing, counsel for HSA requested a continuance because he had become aware that the children initiated three phone calls to speak to plaintiff.  Id. at 36.  Mazzera agreed to the continuance because the calls were contrary to what they told him about wanting communication with plaintiff: "And so this will give me a chance to look at it further and also give a chance to have the children deal with the therapy and maybe this can be resolved."  Id. at 37.  Plaintiff, through counsel, argued for visitation with the children and a psychological evaluation of the children.  Id. at 38-40.  He also challenged the court's order authorizing visitation at the

1  discretion of the social worker and the therapist.  Id. at 38.  Over plaintiff's objection, the court

2  authorized visitation at the discretion of the social worker and the therapist and with consultation

3  with Mazzera.  Id. at 42.  The matter was continued for trial on January 29, 2007.  Id.

4  N.      The January 29, 2007 Trial

5          On January 29, 2007, trial commenced in the dependency case.  Suntag Decl., Ex.

6  F at 48-140.  Testimony was taken from both children, as well as their therapist, Tweedy.

7  Champagne testified that "[a]t this point I would not like to visit [plaintiff], but in the future,

8  yes."  Id. 51:24–52:9.  She testified that she would consider visitation with plaintiff "in the

9  future" if a counselor was present, id. 52:20-26; she would consider other forms of contact, such

10 as telephone calls, "[p]ossibly in the future . . . but right now, no," id. 53:15-23; and she didn't

11 want to have telephone contact with plaintiff at that time because she didn't want to get him

12 upset, id. 53:24-26.  She also stated that she had written two letters to plaintiff, and plaintiff had

13 written "nice" letters back.  Id. 54:27–55:4.  On cross-examination, Champagne testified that she

14 was concerned for her safety if she was to have unsupervised visitations with plaintiff.  Id.

15 55:26-28.  She testified that there existed a possibility that plaintiff would kidnap her and

16 Cleariana in violation of court order.  Id. 59:3-7. Champagne again stated that she would

17 consider having supervised visitation with plaintiff, but "[n]ot at this point" "[b]ecause I'm

18 afraid of my father."  Id. 62:27–63:3.  She then stated definitively "At this point, no, I would not

19 like to visit my dad right now."  Id. 63:14-15.

20         Cleariana testified that "at this point" she did not want to have visitation with

21 plaintiff regardless of whether a counselor was present.  Suntag Decl., Ex. F at 70:2-9.  She

22 testified that he did not know when she would want visitation with him, but stated that she was

23 angry with plaintiff for hitting them, for sending Boddy letters "tell her she was a black widow

24 and filling [the children] with poison," and for plaintiff's conduct during three phone calls

25 initiated by the children.  Id. at 70:15–72:1.  She further stated that she was unwilling to visit or

26 entertain phone calls with plaintiff, but she was willing to receive letters from him although she

1  would not want to write back.  Id. at 72:6-28.  On cross examination, Cleariana testified that she

2  was unsure what would change her mind about visitation with plaintiff "[b]ecause I don't know

3  if [plaintiff]'s going to change."  Id. at 74:25-28.

4            Next, Tweedy testified that the children were "very adamant" during counseling

5  sessions about not wanting visits or phone calls with plaintiff.  Suntag Decl., Ex. F at 80:9-13.

6  She stated that the children have told her "[t]hat they're afraid of [plaintiff].  They're angry with

7  him.  They're going – if they talk to him, they might tell him more than they want to tell him.

8  He will come and kidnap them from school.  That after the phone call they had nightmares and

9  flashbacks of him hitting them and putting them – locking them in a closet.  Just very negative

10  things about the dad."  Id. 81:5-10.  She expressed concern that the children would become

11  anxious, fearful or insecure if required to participate in supervised visitation with plaintiff.  Id.

12  81:26-27.  She testified that she felt it "might be harmful" to require the children to visit with

13  plaintiff.  Id. 82:2-4.  However, she did state that there could be a benefit to required supervised

14  visits because the children could learn to trust plaintiff.  Id. 86:15-21.

15            The children's social worker, Debra Lewis, also testified.  She stated that the

16  reason she has not recommended visitation with plaintiff is "[b]ecause I do not feel it would be

17  beneficial to [the children] to visit with [plaintiff] or talk with him if they clearly state they do

18  not want to."  Suntag Decl., Ex. F at 98:3-5.

19            Following further testimony, the court adopted the November 2006 CPS Report,

20  and ordered two supervised visits between plaintiff and the children prior to the next scheduling

21  hearing on February 28, 2007.  Suntag Decl., Ex. F at 139:7-16.

22  O.     Visitation Following Trial

23            Between January 29, 2007 and February 28, 2007, plaintiff participated in two

24  supervised visits with the children.  Pl.'s Dep. 401:11-22.  Because both of these visits went

25  well, the children's social worker recommended increased supervised visits and sought

26  unsupervised telephone contact during the February 28, 2007 hearing, which the court

1  authorized.  Suntag Decl., Ex. F at 143.  The court also authorized that the children be placed

2  with their mother before the next hearing date. Id. at 144:4-5.

3       In March 2007, the children were placed in their mother's care.  Mazzera Decl.,

4  ¶ 24; Pl.'s Dep. 401:23–402:2.

5       Plaintiff continued to have supervised visits with the children until May 2007.

6  Pl.'s Dep. 400:12–401:22; 402:3–405:5.  At a hearing held on May 2, 2007, Mazzera

7  recommended, and the court ordered, modified supervised visits between plaintiff and the

8  children, with the modification being the presence of an adult family member in a non-

9  institutionalized setting.  Suntag Decl., Ex. F at 148-49.

10       At a hearing held on May 30, 2007, Mazzera agreed to unsupervised visits with

11  the children.  Manning Decl., Ex. D at 150, 152:22-28.

12       The only scheduled visits that did not occur were the result of Boddy's failure to

13  bring the children to the CPS building for a visit.  Pl.'s Dep. 338:1–340:8.

14  P.    The Choking Incident

15       In August 2007, Mazzera was informed by the children's social worker that

16  plaintiff tried to choke Cleariana during an unsupervised visit at their home in Kelseyville.

17  Mazzera Decl. ¶ 27.

18       On August 20, 2007, the court held a hearing on the choking incident.  Mazzera

19  Decl. ¶ 27; Suntag Decl., Ex. F at 155-60.  In light of the incident, Mazzera requested that the

20  children be referred to counseling and that visits with plaintiff be temporarily suspended: "Part

21  of my hope is one would be able to get counseling started right away, because these children

22  they expressed to me they love their dad.  Something happened during the visit that really upsets

23  them.  I need for them to deal with it.  My hope if they can talk to somebody about this and

24  maybe if the therapist agrees with it then shortly after the start of this, within a couple weeks I'm

25  hoping this therapy with the children that maybe we can bring dad in this so they can discuss this

26  with somebody mediating it in a way to find out what happened and try to get things back on

1  track." See id. at 157:12–158:4.  Mazzera stated that the children were amenable to telephone

2  contact with plaintiff.  Id. at 158:7-11.  Counsel for plaintiff did not oppose Mazzera's request.

3  Id. at 158:13–159:9.  The court, therefore, suspended visitation pending the next court hearing

4  with discretion given to the social worker to expand visitation if progress is made during

5  counseling.  Id. at 159:13-15, 160:1-2.

6        Supervised visits between plaintiff and the children resumed in September 2007.

7  Mazzera Decl., ¶ 28.  Unsupervised visits resumed in November 2007.  Id.

8        The dependency case was dismissed without prejudice on January 23, 2008.

9  Suntag Decl., Ex. F at 172.  Final judgment was entered on April 1, 2008.  RJN, Ex. 4.

10  Q.   Communications Between Plaintiff and the Children

11        For the brief period of time that Holden was the children's social worker, he was

12  asked to direct communications between the children and plaintiff.

13        As for communications sent by the children, on June 16, 2006, Champagne gave

14  Holden a letter for plaintiff, which Holden faxed to plaintiff that day at a fax number given by

15  plaintiff.  Holden Decl., ¶ 17. Ex. G.  Plaintiff confirmed receipt of this letter.  Pl.'s Dep. at

16  120:6-8.  During the time that Holden was the children's assigned social worker, Cleariana never

17  wrote a letter to plaintiff.  Cleariana Depo 138, 140.

18        As for communications and items sent by plaintiff, during Holden's first meeting

19  with the children at MGCS, he gave them a long letter from plaintiff.  Champagne Dep. 104:1-4.

20  Cleariana testified at her deposition that Holden gave her at least one letter from plaintiff.

21  Cleariana Depo 127.

22        In June or July 2006, plaintiff sent letters, National Geographic magazines and

23  handwritten puzzles to Holden to be delivered to the children.  Holden delivered these items to

24  the children.  Holden Decl. ¶ 18.  The children confirmed receipt of these items in their

25  depositions.  Cleariana Dep. 145:15-25; Champagne Dep. 168:14–169:5.

26  /////

1    Holden gave the children photographs that plaintiff had given him.  Holden Decl.

2    ¶¶ 25-26; Champagne Dep. 125:25–126:6; 130:21–131:21.

3    Plaintiff faxed six letters to Holden for the children.  Pl.'s Dep. 453:18–454:6.

4    Plaintiff admitted that Holden gave one of them to the children.  Id.  The other five letters were

5    given by Holden to personnel at the visitation center to deliver to the children.  Holden Decl.

6    ¶ 25.  Champagne confirmed in her deposition that she received six letters while in foster care.

7    Champagne Dep. 107:5-13, 108:2-7.

8    RELEVANT PROCEDURAL BACKGROUND

9    This action was initiated on April 22, 2008 for violations of plaintiff's Fourth,

10   Sixth and Fourteenth Amendment rights in connection with a child custody dispute.  Doc. No. 1.

11   Plaintiff also filed an application to proceed in forma pauperis.  On June 25, 2008, the

12   undersigned screened the complaint pursuant to 28 U.S.C. § 1915(e)(2).  Doc. No. 5.  Plaintiff's

13   Sixth Amendment claim was dismissed as inapplicable to the allegations set forth in the

14   complaint.  Additionally, plaintiff was advised that the complaint failed to set forth charging

15   allegations as to any of the named governmental entities.  Accordingly, the complaint was

16   dismissed, and plaintiff was granted leave to amend.

17   On October 3, 2008, plaintiff filed a first amended complaint stating claims under

18   the Fourth and Fourteenth Amendments and adding a state law negligence claim.  Doc. No. 8.

19   On November 6, 2008, the court screened the first amended complaint and found service

20   appropriate for defendants San Joaquin Office of Child Protective Services, Kenneth Egi,

21   Christopher Holden, Ernie Schmidt, Donna Dones, Victor Vincent, San Joaquin County Sheriff's

22   Department, Jeff Luck, Thomas Mazzera and the Manteca Police Department.[8]  Doc. No. 15.

23   On February 24, 2009, Mazzera filed a motion to dismiss.  Doc. No. 24.  On

24   March 2, 2009, defendant San Joaquin County filed a motion to dismiss.  Doc. No. 31.  During

25   _____

26   [8] On June 1, 2009, plaintiff filed a notice of voluntary dismissal, dismissing defendants
Manteca Police Department and Victor Vincent.  Doc. No. 63.

1   the pendency of those motions, plaintiff filed a request to amend the first amended complaint.

2   Doc. No. 39.  Plaintiff's request was denied for failure to submit a proposed second amended

3   complaint.  Doc. No. 40.  On April 17, 2009, plaintiff filed a second amended complaint.  Doc.

4   No. 42.

5          On May 5, 2009, the undersigned submitted findings and recommendations

6   recommending that plaintiff's Fourth Amendment claim and state negligence claim be dismissed.

7   Doc. No. 49.  The undersigned also recommended dismissal of defendants Schmidt, Luck and

8   San Joaquin County.  The court also dismissed plaintiff's proposed second amended complaint

9   with direction regarding the filing of a third amended complaint.

10          On June 8, 2009, the Honorable Garland E. Burrell, Jr. adopted in full the May 5,

11   2009 findings and recommendations.  Doc. No. 66.  Judge Burrell also granted plaintiff leave to

12   file a third amended complaint ("TAC") with the following direction:

> Within thirty days from the date of this order, plaintiff shall file a proposed third
> amended complaint that complies with the May 5, 2009 findings and
> recommendations.  Plaintiff shall specifically set forth facts supporting his claim
> that defendants Holden and Mazzera interfered with his right to family
> association, including specific instances defendants denied him visitation with his
> minor children.

Doc. No. 66 at 2.

          On July 23, 2009, plaintiff filed the operative TAC naming Egi, Dones, Holden

and Mazzera and setting forth claims under the Fourteenth Amendment as to all defendants and

the First Amendment as to Holden only.  Doc. No. 73.  Specifically, plaintiffs claims defendants

conspired to keep his children from him and made false statements to the state dependency court,

in violation of the Fourteenth Amendment. Additionally, plaintiff contends Holden violated his

First Amendment rights by preventing plaintiff from communicating with the children.  Plaintiff

seeks injunctive relief, costs for the juvenile dependency proceedings plus 10%, costs for this

federal action plus 10%, $15,000 for each of the minors' depleted college fund, punitive

damages in the amount of $1, and other relief that the court and/or jury may deem proper.

1    On December 2, 2009, defendants Mazzera and Holden filed an Answer.  Doc.

2  Nos. 83, 84.  On April 28, 2010, defendant Dones filed an Answer.  Doc. No. 95.  Egi has not yet

3  been served in this action.

4    The court issued a scheduling order on December 10, 2010.  Doc. No. 124.

5  Following multiple discovery disputes and requests to modify the scheduling order, this action is

6  now pending on Mazzera and Holden's separate motions for summary judgment or, in the

7  alternative, partial summary judgment.  Plaintiff has not filed an opposition to either motion,

8  though on July 5, 2012 he did file a declaration in opposition to Mazzera's request for judicial

9  notice in support of his motion for summary judgment, Doc. No. 208, and a response to both

10  Holden and Mazzera's separate statements of undisputed facts in support of their respective

11  motions for summary judgment, Doc. Nos. 206, 209.

12    This case is presently scheduled for a pretrial conference on July 30, 2012 before

13  Judge Burrell.  Trial is scheduled to commence on October 9, 2012.

14    Also pending before the court is defendant Mazzera's motion to strike the afore-

15  mentioned documents filed on July 5, 2012 by plaintiff in violation of this court's June 21, 2012

16  order directing plaintiff to file an opposition on or before July 3, 2012.

17                                   STANDARDS

18    Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant

19  summary judgment if the movant shows that there is no genuine dispute as to any material fact

20  and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[9]  A shifting

21  burden of proof governs motions for summary judgment under Rule 56.  Nursing Home Pension

22  Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir.

23  2010).  Under summary judgment practice, the moving party

24

25    [9]  Federal Rule of Civil Procedure 56 was revised and rearranged effective December 10,
26  2010.  However, as stated in the Advisory Committee Notes to the 2010 Amendments to Rule
   56, "[t]he standard for granting summary judgment remains unchanged."

1    always bears the initial responsibility of informing the district court of the basis
     for its motion, and identifying those portions of "the pleadings, depositions,
2    answers to interrogatories, and admissions on file, together with the affidavits, if
     any," which it believes demonstrate the absence of a genuine issue of material
3    fact.

4    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56©).

5    "Where the non-moving party bears the burden of proof at trial, the moving party need only

6    prove that there is an absence of evidence to support the non-moving party's case."  In re Oracle

7    Corp. Sec. Litig., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ.

8    P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not

9    have the trial burden of production may rely on a showing that a party who does have the trial

10   burden cannot produce admissible evidence to carry its burden as to the fact").

11          If the moving party meets its initial responsibility, the opposing party must

12   establish that a genuine dispute as to any material fact actually does exist.  See Matsushita Elec.

13   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986).  To overcome summary

14   judgment, the opposing party must demonstrate the existence of a factual dispute that is both

15   material, i.e., it affects the outcome of the claim under the governing law, see Anderson v.

16   Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores

17   Brand Mgmt., Inc., 618 F.3d 1025, 1031 (9th Cir. 2010), and genuine, i.e., "'the evidence is such

18   that a reasonable jury could return a verdict for the nonmoving party,'" FreecycleSunnyvale v.

19   Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010) (quoting Anderson, 477 U.S. at 248).  A

20   party opposing summary judgment must support the assertion that a genuine dispute of material

21   fact exists by:  "(A) citing to particular parts of materials in the record, including depositions,

22   documents, electronically stored information, affidavits or declarations, stipulations . . . ,

23   admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do

24   not establish the absence or presence of a genuine dispute, or that an adverse party cannot

25

26

1   produce admissible evidence to support the fact."[10]  Fed. R. Civ. P. 56(c)(1)(A)-(B).  However,

2   the opposing party "must show more than the mere existence of a scintilla of evidence."  In re

3   Oracle Corp. Sec. Litig., 627 F.3d at 387 (citing Anderson, 477 U.S. at 252).

4          In resolving a summary judgment motion, the evidence of the opposing party is to

5   be believed.  See Anderson, 477 U.S. at 255.  Moreover, all reasonable inferences that may be

6   drawn from the facts placed before the court must be viewed in a light most favorable to the

7   opposing party.  See Matsushita, 475 U.S. at 587; In re Oracle Corp. Sec. Litig., 627 F.3d at 387.

8   However, to demonstrate a genuine factual dispute, the opposing party "must do more than

9   simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

10  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

11  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

12                                    DISCUSSION

13  I.     Plaintiff's "Opposition"

14          Before proceeding with the merits of the defendants' respective motions, the

15  undersigned notes that plaintiff has not filed an opposition to either motion.  Rather, he has filed

16  line-by-line objections to a number (though not all) of the defendants' separate statements of

17  undisputed facts.  Additionally, plaintiff has filed a number of attachments, including excerpts of

18  his and the children's depositions with plaintiff's hand-written notes, excerpts of the Petition, a

19  purported declaration signed by the children on April 19, 2010, and various letters apparently

20  written in support of plaintiff during the underlying dependency proceedings.  The court also

21  notes that these documents were filed after the deadline imposed by the undersigned on June 21,

22  2012 to file an opposition.  Plaintiff provides no arguments in opposition to those presented in

23  the defendants' motions.

24  _____

25        [10]  "The court need consider only the cited materials, but may consider other materials in
    the record."  Fed. R. Civ. P. 56(c)(3).  Moreover, "[a] party may object that the material cited to
    support or dispute a fact cannot be presented in a form that would be admissible in evidence."
26  Fed. R. Civ. P. 56(c)(2).

1    Plaintiff's handling of the factual context of the defendants' motion is improper.

2    Local Rule 260 governs submissions for motions for summary judgment.  It provides that:

3        Any party opposing a motion for summary judgment or summary adjudication
         shall reproduce the itemized facts in the Statement of Undisputed Facts and admit

4        those facts that are undisputed and deny those that are disputed, including with
         each denial a citation to the particular portions of any pleading, affidavit,

5        deposition, interrogatory answer, admission or other document relied upon in
         support of that denial.  The opposing may also file a concise "Statement of

6        Disputed Facts," and the source thereof in the record, of all additional material
         facts as to which there is a genuine issue precluding summary judgment or

7        adjudication.

8    Local Rule 260.

9    Plaintiff's attempt at opposing the pending motions is in violation of this local

10   rule.  He not only repeatedly fails to cite to "particular portions" of the record (he, instead, cites

11   generally to the record, as in "See Cleariana's deposition"), he also attempts to create a genuine

12   issue of material fact by disputing the defendants' proffered facts with unsubstantiated

13   allegations of which plaintiff has no personal knowledge (see, e.g., Doc. No. 209 at 11 ¶ 85

14   ["Mazzera, acting according to a well-practiced plan . . . knew all the CPS players and it was

15   easy for him to conspire with them"]).  Additionally, rather than comply with the local rule,

16   plaintiff seeks instead to create a separate narrative from the defendants' perspective.  In a

17   summary judgment motion, the non-moving party is required to respond to the factual

18   allegations of the moving party.  If plaintiff wanted to create his own factual narrative, he should

19   have moved for summary judgment.  Further, plaintiff repeatedly notes in his filings that

20   discovery is needed to properly contest the facts presented by the defendants.  This case,

21   however, has been pending for over four years, and plaintiff has had more than adequate

22   opportunity to conduct discovery.  Finally, plaintiff's filings dispute a number of immaterial

23   facts.  The court will confine its consideration to those facts that it finds relevant to the issues

24   presented.  The court's consideration of these filings, then, will be limited as provided here and,

25   accordingly, Mazzera's request to strike should be denied.

26   /////

II.     Mazzera's Motion for Summary Judgment

In the TAC, plaintiff brings a civil rights claim pursuant to the Fourteenth Amendment against Mazzera for (a) misstating the children's preference as to visitation with plaintiff at the May 5, 2006 hearing, (b) making false statements in court, including claiming that the children were "terrified" of their father, (c) failing to meet the children until immediately before the July 18, 2006 hearing, (d) conspiring with the other defendants to keep the children from plaintiff, and (e) failing to protect the children after they were sent to live with their mother in a house without running water and in a dangerous locale.  This claim is premised on the Substantive Due Process Clause of the Fourteenth Amendment, which protects the fundamental liberty interest of parents in the care, custody, and management of their children.  Santosky v. Kramer, 455 U.S. 745, 753 (1982).  Indeed, "the constitutional right of parents and children to live together without governmental interference is clearly established."  Mabe v. San Bernardino County, Dept. of Public Soc. Services, 237 F.3d 1101, 1107 (9th Cir. 2001); see also Ram v. Rubin, 118 F.3d 1306, 1311 (9th Cir. 1997).

Mazzera seeks summary judgment or, in the alternative, partial summary judgment, on the following grounds: (a) the Rooker-Feldman doctrine bars plaintiff's claims against Mazzera; (b) plaintiff cannot satisfy the state action requirement of his civil rights claim; and (c) Mazzera did not engage in unconstitutional conduct causing a deprivation of plaintiff's constitutional rights.

A.      Rooker-Feldman Doctrine

The Rooker–Feldman doctrine is derived from two United States Supreme Court cases.  See Dist. of Columbia Ct. of Appeals v. Feldman, 460 U.S. 462, 483 n.16 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 416 (1923).  The Rooker–Feldman doctrine "stands for the relatively straightforward principle that federal district courts do not have jurisdiction to hear de facto appeals from state court judgments."  Carmona v. Carmona, 603 F.3d 1041, 1050-51 (9th Cir. 2010); see Dubinka v. Judges of Sup.Ct., 23 F.3d 218, 221 (9th Cir. 1994) ("Federal district

courts may exercise only original jurisdiction; they may not exercise appellate jurisdiction over state court decisions.").  Under the Rooker–Feldman doctrine, a federal district court is precluded from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).  The Rooker–Feldman doctrine applies not only to final state court orders and judgments, but to interlocutory orders and non-final judgments issued by a state court as well.  Doe & Assoc. Law Offices v. Napolitano, 252 F.3d 1026, 1030 (9th Cir. 2001); Worldwide Church of God v. McNair, 805 F.2d 888, 893 n.3 (9th Cir. 1986).

The Rooker–Feldman doctrine prohibits "a direct appeal from the final judgment of a state court," Noel v. Hall, 341 F.3d 1148, 1158 (9th Cir. 2003), and "may also apply where the parties do not directly contest the merits of a state court decision, as the doctrine prohibits a federal district court from exercising subject matter jurisdiction over a suit that is a de facto appeal from a state court judgment." Reusser v. Wachovia Bank, N.A., 525 F.3d 855, 859 (9th Cir. 2008) (internal quotation marks omitted).  "A suit brought in federal district court is a 'de facto appeal' forbidden by Rooker–Feldman when 'a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision.'" Carmona, 603 F.3d at 1050 (quoting Noel, 341 F.3d at 1164); see Doe v. Mann, 415 F.3d 1038, 1041 (9th Cir. 2005) ("[T]he Rooker–Feldman doctrine bars federal courts from exercising subject-matter jurisdiction over a proceeding in 'which a party losing in state court' seeks 'what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights.'") (quoting Johnson v. De Grandy, 512 U.S. 997, 1005-06 (1994), cert. denied, 547 U.S. 1111 (2006)).

"[A] federal district court dealing with a suit that is, in part, a forbidden de facto appeal from a judicial decision of a state court must refuse to hear the forbidden appeal.  As part

24

of that refusal, it must also refuse to decide any issue raised in the suit that is 'inextricably

intertwined' with an issue resolved by the state court in its judicial decision."  Doe, 415 F.3d at

1043 (9th Cir. 2005) (quoting Noel, 341 F.3d at 1158); see Exxon, 544 U.S. at 286 n. 1 (stating

that "a district court [cannot] entertain constitutional claims attacking a state-court judgment,

even if the state court had not passed directly on those claims, when the constitutional attack [is]

'inextricably intertwined' with the state court's judgment") (citing Feldman, 460 U.S. at 482

n.16)); Bianchi v. Rylaarsdam, 334 F.3d 895, 898, 900 n.4 (9th Cir. 2003) (stating that "claims

raised in the federal court action are 'inextricably intertwined' with the state court's decision

such that the adjudication of the federal claims would undercut the state ruling or require the

district court to interpret the application of state laws or procedural rules") (citing Feldman, 460

U.S. at 483 n. 16, 485).

Although not couched as a direct challenge to the juvenile court's detention and

visitation orders, defendant argues that insofar as plaintiff's TAC can be read to argue that there

lacked a factual basis for the juvenile court to deny him visitation with the children, plaintiff is

prohibited from doing so pursuant to the Rooker-Feldman doctrine.  The undersigned agrees that

it must decline consideration or re-consideration of the juvenile court's judicial decisions

concerning visitation and placement of the children.  Accordingly, the court declines to consider

any of the plaintiff's claims as they relate to the propriety or necessity of the juvenile court's

visitation and custody orders.

B.    Failure to State a Claim

1.    No State Action

Mazzera next argues that plaintiff's civil rights claim fails as a matter of law

because plaintiff cannot satisfy the state action requirement.

Section 1983 creates a cause of action against any person who, acting under color

of state law, violates the constitutional rights of another person.  See 42 U.S.C. § 1983.

Accordingly, to sustain a Section 1983 action, plaintiff must show (1) the conduct complained of

1  was committed by a person acting under color of state law, and (2) the conduct deprived the

2  plaintiff of a constitutional right.

3         Here, Mazzera was, at the time of his appointment to represent the minors and

4  throughout the dependency proceedings, a private attorney.  To determine whether a private

5  actor acts under color of state law, the court evaluates whether the alleged infringement of

6  federal rights is "fairly attributable" to the government even though committed by private actors.

7  Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003).  In terms of counsel appointed by courts

8  in other contexts, it is well-settled that a public defender appointed to represent a criminal

9  defendant is not a state actor and does not act under color of state law for the purposes of a

10  Section 1983 claim.  See Polk County v. Dodson, 454 U.S. 312, 325 (1981) (holding that a

11  public defender does not act under color of state law when performing traditional functions as

12  counsel in a criminal proceeding); accord Miranda v. Clark County, Nev., 319 F.3d 465, 468

13  (9th Cir. 2003) (en banc) (holding that, as a matter of law, a public defender who was appointed

14  to represent a criminal defendant in a traditional lawyer role was not a state actor despite the fact

15  that he was "paid by government funds and hired by a government agency").

16         Additionally, courts have persuasively held that counsel appointed to represent

17  minors in state court juvenile proceedings, either as counsel or guardians ad-litem, are not

18  considered state actors for the purpose of a Section 1983 claim.  See Kirtley, 326 F.3d at

19  1092-96 (holding that a private attorney appointed by the state to represent a minor in court

20  proceedings as guardian ad litem does not act under color of state law for the purpose of a

21  Section 1983 claim); Malachowski v. City of Keene, 787 F.2d 704, 710 (1st Cir. 1986) (per

22  curiam) (holding that a private attorney appointed by court to represent minor in state court

23  juvenile delinquency proceedings does not act under color of state law for the purpose of a

24  Section 1983 claim), cert. denied, 479 U.S. 828 (1986); Chambers v. Santa Clara County, No. C

25  05-3308 SI, 2006 WL 2433413, at *3 (N.D. Cal. Aug. 21, 2006) (unpublished) (same).

26  Similarly, a judge of this court persuasively concluded that an attorney in private practice who

26

was appointed by a court to represent children in child custody proceedings did not act under color of state law for the purpose of a Section 1983 claim subsequently brought by the children's parent against the appointed counsel. Deluz v. Law Offices of Frederick S. Cohen, No. 10-cv-0809 GEB DAD, 2011 WL 677914, at *4-5 (E.D. Cal. Feb. 17, 2011) (unpublished), adopted by Order, Mar. 22, 2011.

Insofar as the alleged constitutional violations are concerned, Mazzera acted as court-appointed counsel for Champagne and Cleariana and represented them in connection with juvenile dependency proceedings. Such court-appointed representation cannot be deemed to be fairly attributable to the government such that Mazzera can be said to have been acting under color of state law. Accordingly, the undersigned recommends that Mazzera's motion for summary judgment be granted as a matter of law.

2.      No Evidence of Conspiracy

Plaintiff also claims that defendants acted in concert to deprive him of his constitutional rights "by intruding upon his family relationships, seizing his children and interfering with his parental rights without cause." TAC at 3. Notwithstanding the foregoing, the court also recommends granting defendant's motion for summary judgment on this claim.

A plaintiff must state specific facts, not mere conclusory statements, to support the existence of an alleged conspiracy. Burns v. County of King, 883 F.2d 819, 821 (9th Cir. 1989); Williams v. Sumner, 648 F. Supp. 510, 513 (D. Nev. 1986). Although "pro se pleadings are liberally construed, particularly where civil rights claims are involved," Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988), a "liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled." Ivey v. Board of Regents of Univ. of Alaska, 673 F.2d 266, 268 (9th Cir. 1982). Plaintiff's TAC is completely devoid of any factual allegations that the defendants had an agreement or "meeting of the minds" to conspire to violate plaintiff's constitutional rights. Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 626 (9th Cir. 1988). As the Ninth Circuit has held, "to state a claim

1   for a conspiracy to violate one's constitutional rights . . . , the plaintiff must state specific facts to

2   support the existence of the claimed conspiracy."  Burns v. County of King, 883 F.2d 819, 821

3   (9th Cir. 1989) (per curiam).  Claims based on vague and conclusory allegations, which fail to

4   specify each defendant's role in the alleged conspiracy, are subject to dismissal.  Pena v.

5   Gardner, 976 F.2d 469, 471 (9th Cir. 1992).

6                  In this case, plaintiff makes generalized claims of conspiracy without any

7   supporting evidence.  As to Mazzera, plaintiff alleges that he was involved in or should have

8   been aware of a conspiracy to "kidnap" the minors from plaintiff, see Pl.'s Dep. 117:2-4, yet he

9   admits that he has no personal knowledge of a conspiracy and no evidence to support his claim.

10  See id. 259:24-260:2 (admitting plaintiff has no personal knowledge of communications between

11  Mazzera and anyone from CPS); id. 260:8-262:7 (claiming that Mazzera was involved in a

12  conspiracy to kidnap the children based solely on Mazzera's appointment to represent the

13  children); id. 363:4-365:25 (claiming Mazzera participated in a conspiracy by refusing to

14  communicate with plaintiff's attorneys, but then admitting that his attorneys never told him that

15  Mazzera refused to communicate with them); id. 366:20-367:3 (admitting that he didn't know

16  what Mazzera's "role in this whole affair was truly," but surmising that it was "the negative

17  attitude and approach to his job [that] caused [plaintiff] to see it as a conspiracy"); id. 371:4-

18  372:14 (expressing opinion that everyone involved in a dependency proceeding is a participant

19  in a conspiracy only "under the condition that something goes wrong").

20                 Based on this record, the court finds no dispute of material fact as to the existence

21  of a conspiracy.  Accordingly, summary judgment should be entered on this claim.

22         C.      Specific Allegations

23                 As to plaintiff's specific allegations of unconstitutional conduct by Mazzera,

24  suffice it to say that the court finds no evidence of unconstitutionality on the record before it.

25  /////

26  /////

The evidence reveals that Mazzera represented the children adequately by meeting with them early and regularly.  See, e.g., Champagne Dep. 307:16-19 (stating that she met Mazzera shortly after the May 4, 2006 hearing); Mazzera Decl., Ex. A at 2, 11 and 16.

Next, Mazzera's statements and recommendations to the court were based on his conversations with the children, as well as the uncontested facts set forth in the Police Report and the Detention Report.  These same facts, which were presented in the Petition, were stipulated to by the plaintiff at the July 17, 2006 hearing.

Consistent with the Police Report, the Detention Report and the Petition, both children testified in the dependency proceedings and in this case that plaintiff physically harmed them, that they sustained welts and bruises upon being hit by plaintiff, that plaintiff cursed at them, that plaintiff took nude photographs of them, and that plaintiff possessed pornography.  As to the Police Report, Cleariana testified in this case that those portions of the Police Report that were attributed to her were true.  Cleariana Dep. 100:12-103:24, 104:25-105:15, 108:13-15.  Champagne testified that she told Deputy Luck that plaintiff hit her with a stick and called her a "bitch."  Champagne Dep. 82:11-13, 87:1-4.  She also testified that the statements she made to Deputy Luck were true.  Id. 331:1-3.

As to the Dependency Report, Cleariana testified that everything she told Egi was the truth.  Cleariana Dep. 114:24-115:3.  She told him that she wanted to live with her mother instead of with plaintiff, that plaintiff cussed at her, that plaintiff's cussing made her uncomfortable, that plaintiff took nude photographs of her and Champagne, that plaintiff hit her sometimes with a stick and with his hand, and that she sometimes had welts and bruises after being hit.  Id. 115:4-118:21.  Champagne testified that she told Egi she wanted to live with her mother instead of plaintiff, that plaintiff cursed at her, that plaintiff called her "bitch," that plaintiff's cursing made her uncomfortable, that plaintiff hit her with his hand and a stick, that she suffered a bruise and welts after being hit, and that plaintiff once made her nose bleed after he hit her.  Id. 89:19–93:9.

1    Moreover, on review of the transcripts from the dependency hearings, the court

2 finds no evidence that Mazzera stated the children were "terrified" of plaintiff.  See Suntag

3 Decl., Ex. F.  Even if he had made such a statement, however, the children themselves testified

4 during the dependency proceedings that they did not want visitation with their father because

5 they were afraid of him.  See, e.g., Suntag Decl., Ex. F at 62:27–63:3 (Champagne testified that

6 she did not want visitation with plaintiff because she was "afraid" of him).  There is no evidence

7 of a constitutional violation here.

8    Lastly, plaintiff presents no basis for the proposition that his constitutional rights

9 were violated by Mazzera's alleged failure to ensure that the children lived in a home with

10 running water and the like.

11    For all of the foregoing reasons, the undersigned recommends that Mazzera's

12 motion for summary judgment be granted.

13 III.    Holden's Motion for Summary Judgment

14    In the TAC, plaintiff claims Holden violated his First and Fourteenth Amendment

15 rights.  Specifically, plaintiff contends Holden violated his Fourteenth Amendment rights by (a)

16 making false allegations in the Petition, (b) conspiring with Mazzera to keep the children from

17 him, and (c) denying plaintiff visitation with the children.  He also claims Holden violated his

18 First Amendment rights by preventing communication between plaintiff and the children.

19    Holden seeks summary judgment or, in the alternative, partial summary judgment,

20 on the following grounds: (a) the Rooker-Feldman doctrine bars plaintiff's claims against

21 Holden; (b) Holden has absolute immunity; (c) plaintiff is barred from pursuing his First

22 Amendment claim; and (d) plaintiff's specific claims against Holden fail.

23    A.    Rooker-Feldman Doctrine

24    For the reasons set forth supra, the undersigned declines to consider plaintiff's

25 claims to the extent they challenge the juvenile court judicial orders.

26 /////

1    B.    Fourteenth Amendment Claim

2         1.    Absolute v. Qualified Immunity

3         Holden argues that he is entitled to summary judgment because he, as a social

4    worker, had immunity.  The Ninth Circuit has held that, based on the similarity in the functions

5    performed by social workers to the functions performed by prosecutors, "social workers are

6    entitled to absolute immunity in performing quasi-prosecutorial functions connected with the

7    initiation and pursuit of child dependency proceedings."  Meyers v. Contra Costa Cnty. Dep't of

8    Soc. Servs., 812 F.2d 1154, 1157 (9th Cir. 1987).  In the same decision, however, the Ninth

9    Circuit held that absolute immunity does not apply to social workers' actions that "preceded the

10   institution of judicial proceedings."  Id. at 1155.  More recently, the Ninth Circuit clarified that

11   social workers "are not entitled to absolute immunity from claims that they fabricated evidence

12   during an investigation or made false statements in a dependency petition affidavit that they

13   signed under penalty of perjury."  Beltran v. Santa Clara Cnty., 514 F.3d 906, 908 (9th Cir.

14   2008) (per curiam).  Insofar as plaintiff alleges Holden made false statements in the Petition,

15   Beltran does not entitle Holden to absolute immunity.

16        As to plaintiff's claim that Holden improperly denied visitation with the children

17   after court proceedings were initiated, under Saucier v. Katz, 533 U.S. 194 (2001), courts apply a

18   two-part test to determine if qualified immunity shields a defendant from liability.  First, "do the

19   facts alleged show the officer's conduct violated a constitutional right?"  Id. at 201.  And second,

20   if the officer's conduct did deprive plaintiff of a constitutional right, the court analyzes whether

21   "the right was clearly established."  Id.  Here, there is no need to reach the second step of the

22   Saucier analysis because there is no evidence that Holden violated plaintiff's constitutional

23   rights.  The record evidences that plaintiff was denied visitation with the children on only one

24   occasion on May 8, 2006.  Holden has declared that his decision to deny visitation was based on

25   the children's conversation with Mazzera on May 5, 2006, wherein they both stated that they did

26   not want to visit with plaintiff.  Mazzera Decl., ¶ 7; Holden Decl., ¶ 14, Exs. A at 4, B at 4.  In

this case, Cleariana testified that she did not want to see plaintiff until after she was living with

Boddy.  Cleariana Dep. 332:7-20.  Champagne testified that she initially wanted supervised

visits with plaintiff, but changed her mind to protect Cleariana, who did not want visits with him.

Champagne Dep. 125:12-19, 300:22–301:2, 325:13-22.  This evidence refutes plaintiff's

suggestion that Holden repeatedly and without justification denied him visitation with the

children.  See TAC ¶¶ 70-71, 73.  Plaintiff has offered no admissible evidence in opposition to

refute Holden's declaration that his discretionary decision to deny visitation was based the

children's preference.  Because Holden did not violate plaintiff's constitutional rights, Holden

was protected by qualified immunity.

2.   <u>Specific Allegations</u>

a.   <u>False Statements in the Petition</u>

Although Holden is not entitled to absolute immunity on plaintiff's claim that he

made false statements in the Petition, the record reveals that there is no dispute of material fact

with respect to this claim.  As previously noted, the factual basis presented in the Petition was

stipulated by plaintiff at the July 17, 2006 hearing.  Additionally, plaintiff admitted in this

case that he has taken nude photographs of the children, Pl.'s Dep. 75:4-12, 80:5–81:7; that he

took nude photographs of the children at Cobb Mountain, id. 88:8-12; that he hit the children

with a stick, id. 90:22-24; that he hit the children with a brush, id. 99:1-2; that he hit the children

with his hands 20-30 times, id. 93:1-16; that when he hit the children, they would cry and

scream, id. 96:22–97:3; that he has left welts on their bodies as a result of hitting them, id. 95:15-

16; and that he has called the children "bitch," id. 101:23-25.  Moreover, the Petition relied on

the children's statements as set forth in the Police Report and the Detention Report, statements

which have been corroborated by the children's testimony both in the dependency proceedings

and in this case.  Because there is no basis on which a jury could find that the factual allegations

in the Petition were fabricated, summary judgment should be entered on this claim.

/////

b.      Denying Contact with the Children

There is also no dispute as to plaintiff's claim that Holden improperly denied him visitation with the children.  The record reflects that Holden denied visitation only once on May 8, 2006 after the children informed Mazzera that they did not want to visit with plaintiff.  While plaintiff may disagree with the social worker's recommendation, he has not presented any evidence that the denial of visitation was based on fabricated evidence or false statements. Absent such evidence, plaintiff has not raised a triable issue of fact.

c.      No Evidence of Conspiracy

For the reasons set forth supra, plaintiff's conspiracy claim fails.

B.      First Amendment Claim

Plaintiff also claims that defendant Holden violated his First Amendment rights by "curtailing his written communication with his children and disallowing the children to communicate with him by letters." TAC at 4, ¶ 14.  Even assuming this to be a constitutionally protected right, the undisputed evidence reveals that, during the time period in which Holden was the children's assigned social worker, he either delivered the items that plaintiff gave him directly to the children, to personnel at the visitation center to be delivered to the children or to his supervisor for further handling.  Holden Decl., ¶¶ 24-25.

Plaintiff claims the children did not receive letters he wrote and did not receive photographs he sent.  TAC ¶¶ 74-75. The undisputed facts, however, reveal that plaintiff sent six letters to the children, see Pl.'s Dep. 453:18–454:6, and Champagne testified that she received six letters from plaintiff.  Champagne Dep. 125:20-24, 126:21-25.  She also testified that of those six letters, one or two were given to her by Holden.  Champagne Dep. 126:21-25.  Moreover, Champagne testified that she wrote a letter to plaintiff, which she gave to Holden for delivery. Champagne Dep. 135:14-17; Holden Decl. ¶ 17.  Plaintiff admits receipt of this letter.  Pl.'s Dep. 120:6-8.  As to the photographs that plaintiff claims Holden did not give the children,

/////

1    Champagne testified that Holden gave her approximately 20 photographs.  Champagne Dep.

2    131:4-5.  There is simply no constitutional violation on the facts presented.

3                    Based on the foregoing, IT IS HEREBY ORDERED that Mazzera's request to

4    continue the pretrial conference is granted.  The July 20, 2012 pretrial conference is hereby

5    continued to September 17, 2012 at 1:30 p.m. before Judge Burrell; and

6                    IT IS HEREBY RECOMMENDED that:

7                    1.  Mazzera's motion to strike be denied;

8                    2.  Mazzera's request for judicial notice and motion for summary judgment be

9    granted;

10                   3.  Holden's request for judicial notice and motion for summary judgment be

11   granted.

12                   These findings and recommendations are submitted to the United States District

13   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

14   days after being served with these findings and recommendations, any party may file written

15   objections with the court and serve a copy on all parties.  Such a document should be captioned

16   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

17   objections shall be filed and served within fourteen days after service of the objections.  The

18   parties are advised that failure to file objections within the specified time may waive the right to

19   appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20   DATED: July 20, 2012

21

22

23                                        UNITED STATES MAGISTRATE JUDGE

24

25   /014;leub0853.msj

26

34